VOL. 103, OCTOBER TERM, 1890.     253

The State ex rel. O'Malley v. Lesueur.

THE STATE *ex rel.* O'MALLEY v. LESUEUR, *Secretary of State.*

DIVISION ONE.

1. **Office:** POLITICAL CONVENTION: CERTIFICATE OF NOMINATION: STATUTE. A certificate of nomination of a political convention for an office, in order to be filed with the secretary of state, under the statute should be acknowledged by the presiding officer and secretary of such convention in the same manner as a deed for land. (R. S. 1889, secs. 4757 and 4762; 2395, 2405, 2406, 2408.)

2. ——: ——: SECRETARY OF STATE: MINISTERIAL DUTIES. Although the duties of the secretary of state are ministerial as distinguished from judicial, he is vested with sufficient discretion to pass on the sufficiency of such certificate before filing it in his office.

3. ——: ——: FRAUD IN PRIMARY ELECTIONS. The courts will condemn fraud in primary elections as well as in final elections, when they have acquired jurisdiction in such matters.

4. ——: ——: ESTOPPEL. An agreement between opposing candidates for nomination for office to submit their claims to the state committee of their party is binding on them by way of estoppel.

*Mandamus.*

PEREMPTORY WRIT DENIED.

*T. J. Rowe* for relator.

*W. C. Marshall* for respondent.

SHERWOOD, P. J.—The alternative writ herein was issued in order that the respondent might show cause

why he did not file in his office the certificate of relator, showing his nomination as the democratic candidate for congressman in the eighth district.

The return of the secretary sets forth in substance that the supreme control of the Democratic party of Missouri (except when in convention assembled) has for many years been vested in the Democratic state committee, composed of a representative from each congressional district in the state, which has absolute and supervisory control over said party and all subordinate, congressional, county and city Democratic committees in this state, and which power has always been claimed, many times exercised and never questioned by the members of said Democratic party ; that on the twelfth day of September, 1890, the district Democratic committee of the eighth congressional district, composed of certain wards and parts of wards in the city of St. Louis, etc., published a call for a primary election of delegates in said district, on the seventeenth day of September, 1890, to a convention to be held on September 18, 1890 ; that pursuant to such call an attempt was made on said seventeenth day of September, 1890, to hold such primary election, but which resulted in such disagreements between the judges and clerks of election, and committeemen and voters of the several wards, that two separate voting places, with separate judges and clerks of election, were established in each of such wards, with two separate tickets being voted for, at such respective voting places ; in the one class of voting places O'Malley was voted for, and in the other O'Neill, that in this manner two sets of delegates were elected from each ward, etc., each claiming to be regular Democratic delegates ; that the feeling was very bitter between the rival delegates ; that in some wards a large sum of money was demanded of O'Neill as a condition precedent to Democratic voters voting at such primary election ; that thereupon the two sets of delegates assembled in convention on the eighteenth of September,

1890, but that the confusion, noise and disturbance were so great that is was impossible to organize the convention or to decide which set of delegates was entitled to be called the regular Democratic convention ; which caused the contesting delegates to separate, one set organizing and electing Wm. P. Macklin, as chairman and Peter Lynam as secretary, and nominating Patrick O'Malley as Democratic candidate for congress in said district, and the other electing Walter J. Blakely as chairman and Patrick P. Conner as secretary, and nomi-nating John J. O'Neill as Democratic candidate for con-gress in said district ; that thereafter on the nineteenth of September, 1890, a certificate of the nomination of O'Neill duly and properly made out according to law, signed and acknowledged, etc., was offered to be filed with respondent, but at the same time a protest against filing the same was presented to the respondent from O'Malley, who on the twenty-fifth of September, 1890, presented a certificate signed by Macklin and Lynam and duly made out with certain named exceptions, and asked that the same be filed, which was also accompa-nied by a like protest from O'Neill against the same being filed.

After these statements, the return of respondent proceeds thus :

"That respondent did not then know, and does not now know, which was entitled to be called the Democratic nominee for congress from said district, under said cer-tificates, but that, before respondent had inquired into or decided which was the regular Democratic nominee, the said Democratic state committee under the said power, authority and duty assumed jurisdiction of said controversy, dispute and difficulty, and ordered said O'Neill and said O'Malley to appear before them at St. Louis, on, to-wit, September 29, 1890, to submit their said contentions and claims for its decision and action ; that accordingly on said twenty-ninth of September, 1890, said O'Neill and said O'Malley did appear before

said committee and did freely and voluntarily and without reservation sign an agreement in words and figures following, to-wit:

"Whereas there is a dispute between Mr. O'Malley and Mr. O'Neill as to which is the Democratic candidatefor congress in the eighth congressional district, now in order to have a settlement of the difficulty, we, the contestants aforesaid, hereby agree to submit the matter in controversy to the arbitration of the state Democratic committee for their decision, and we hereby pledge ourselves to abide their decision, and be governed by their action therein.

"'[Signed.]                JOHN J. O'NEILL.'

"That thereupon said O'Neill and said O'Malley produced their witnesses, urged their claims, argued their contentions, and after three days' hearing of said difficulty submitted the same to said committee for their action and decision; that thereafter said committee having heard and being advised of the premises, did on October 1, 1890, order, adjudge and find as follows, to-wit:

"'Whereas the alleged primary election in the eighth congressional district in Missouri, held on the seventeenth day of September, 1890, to elect delegates to a Democratic congressional convention to nominate a candidate for representative in congress, and to elect a congressional committee for said district, was not conducted according to law or precedent, and the methods used unfair and prejudicial to the Democratic voters of said district; and

"'Whereas said primary election, by reason of the unlawful and unfair methods aforesaid resulted in the pretended nomination of two opposing candidates for congress and the election of two opposing congressional committees and has increased and intensified the factional feeling in said district to the injury and detriment of the best interest of the district, and to the great danger of the Democratic party therein; and

The State ex rel. O'Malley v. Lesueur.

" ' Whereas the situation in said district leaves the Democratic party disorganized and without any recognized head or authority in said district, which condition creates an emergency which demands that the qualified Democratic voters shall have a fair and unprejudiced primary election and thereby terminate said contention and open the way for Democratic success in said district, now and hereafter ; and

" ' Whereas said pretended nomination of two opposing candidates for congress and the election of two opposing congressional committees are and were without law or precedent, and are void and not binding on the voters in the district,

" ' Therefore resolved :   That the situation demands and justifies the action of the state Democratic committee as follows :   That an election is hereby ordered for a congressional convention of delegates for said district to nominate a candidate for representative in congress and to elect a congressional committee for said district ; and that said delegates to said convention shall be elected under the ' primary election law ' ( R. S., art. 24, p. 2181 ) ; and the state committee shall fix the basis of representation in said convention and the number of congressional committeemen from each ward, give the notice required by law, appoint the judges of election, and, if the official registration of voters can be procured, the same shall be used at said primary election and Democrats who are qualified voters only shall vote, and in all respects said primary election shall be conducted according to law and all qualified Democrats may be voted for at said election.

" ' That the person receiving the majority of the votes of the delegates present and voting in said convention shall be the only nominee of the Democratic party for congress in said district, and his nomination certificate duly executed by the presiding officer of said convention and the secretary thereof shall be filed in

the office of the secretary of state, and the congressional committee elected by said convention shall be the only lawful and recognized committee for said eighth congressional district until their successors are regularly chosen.

" 'And the executive committee of the state committee is authorized, empowered and directed to do and perform all matters and things necessary or proper to execute and carry out the objects and purposes hereinbefore stated and indicated.'

"Respondent shows that, pursuant to said order of said state Democratic committee, a primary election was duly and properly held for the election of delegates to a convention in said district to nominate a Democratic candidate for representative in congress; that at said primary election the delegates favoring the selection of John J. O'Neill polled twenty-four hundred and fifty votes, which was in excess of the total vote for both O'Malley and O'Neill at the pretended election held on September 17, 1890; that thereafter a convention of said delegates so elected was held and the unanimous vote thereof was cast for John J. O'Neill; that thereafter a certificate of nomination of said John J. O'Neill for representative in congress from the eighth congressional district in Missouri, duly and regularly made out, signed by the president and secretary of said convention and acknowledged according to the formalities required by law for the execution of an instrument affecting real estate was filed with respondent, and thereupon respondent certified such nomination to the recorder of voters of the city of St. Louis and to the county clerk of St. Louis county and decided and determined that said John J. O'Neill was the Democratic candidate for representative in congress from the eighth congressional district in Missouri.

"Respondent further shows that, the premises considered, said state Democratic committee had the sole

The State ex rel. O'Malley v. Lesueur.

power to determine who, if anyone, was the Democratic nominee in said district, and having so decided the difficulty, which was peculiarly a difficulty affecting the Democratic party, and having adjudged such matters and enforced discipline, regularity, fairness and the rights of the voters in said district, and said O'Malley having agreed to abide their decision and be governed by their action in that regard, as he was in duty bound to do whilst he remained a member of the Democratic party,—the said relator ought not longer to have or maintain this action, but that he be estopped from further proceeding herein.''

The reply to this return was the following: ''Relator, Patrick O'Malley, for a reply to the return of the respondent to the alternative writ of *mandamus* heretofore issued herein, denies that the supreme control of the Democratic party (except when said party is assembled in convention) is vested in the Democratic state committee; and relator denies that the Democratic state committee has absolute supervisory and final authority and power over said party or over all subordinate, congressional, county or city Democratic committees in this state, as alleged in respondent's return; relator denies that such power and authority has always been claimed, many times exercised or never questioned by the Democratic party in this state as alleged in said return.

''Relator says that it is not true that, in pursuance to a call made by the eighth Democratic congressional committee for a primary election as alleged in said return, an attempt was made on September 17, 1890, to hold such a primary election which resulted in disagreements between the judges and clerks of election, the several committeemen of the several wards, or the voters, or which terminated in two or more separate voting places or with separate judges and clerks of election being established in each of said wards and parts of

wards, as alleged in said return; and relator says that the primary election called by the eighth district Democratic congressional committee was held on September 17, 1890, at the places designated by the eighth district Democratic congressional committee, and by the judges and clerks, properly, regularly and duly appointed by said district committee.

"Relator says that it is not true that two sets of delegates were elected from each ward, parts of wards, and townships, each claiming to be the regular Democratic delegates; relator denies that the state Democratic committee had the sole power or any right or power to determine who, if anyone, was the Democratic nominee in said district. Relator denies that he is estopped from proceeding by reason of the fact that the state Democratic committee decided to order a new primary election, and to hold another convention as alleged in said return. Relator denies that he agreed to abide by the decision of the state Democratic committee in ordering another primary election and convention, or that he agreed to be governed by their action in usurping such right, power or authority.

"Relator further says that the state Democratic committee in ordering a primary election to be held on October 10, 1890, and a convention of delegates at such primary election to be held October 11, 1890, did so without any right, power or authority so to do, and were guilty of a usurpation of power and authority, and that such power and authority was lodged in no committee or body other than the eighth district Democratic congressional committee.

"Relator further says that the Democratic state committee had no right, power or authority to vacate, annul or set aside the action of the eighth district Democratic congressional convention which selected Patrick O'Malley, relator herein, as the nominee of the Democratic party for the office of representative in congress,

from the eighth congressional district of Missouri, at election to be held November 4, 1890.

"Wherefore relator, having fully answered said return, prays that the writ herein be made peremptory."

I.   Section 4757, Revised Statutes, 1889, provides that: "Any convention of delegates or primary election as hereinafter defined, held for the purpose of making nominations to public office, and also electors to the number hereinafter specified, may nominate candidates for public offices to be filled by election within the state.   Such nomination shall be made by filing a certificate of nomination, executed with the formalities prescribed for the execution of an instrument affecting real estate."

And section 4762, relating to the same subject, declares:  "The certificate of nomination of a candidate for office, selected by any convention of delegates, as herein defined, shall be signed and executed by the presiding officer and secretary of such convention."

The sections just quoted define the requisites of the certificate therein mentioned:  *First.*  It must be signed and executed by the presiding officer and secretary of the nominating convention.  *Second.*  It must be "executed with the formalities prescribed for the execution of an instrument affecting real estate."

Turning to section 2395, Revised Statutes, 1889, we find that those formalities consist not only in the deed being executed, but in its being acknowledged, while section 2405 provides that a certificate of such acknowledgment shall be indorsed on the conveyance, and section 2406 prescribes how it shall be authenticated, and section 2408 what such certificate shall contain.

In the present instance, the certificate on behalf of O'Neill complied fully with the statutory formalities prescribed concerning instruments affecting real estate. Not so, however, with the certificate tendered on behalf of O'Malley; for that, although signed by the presiding

officer and by the secretary, and although it contained a written form of acknowledgment, yet the certificate *never was in fact acknowledged;* so that it was incomplete within the purview of the law, and the secretary might well have refused to file said certificate on this ground alone.   The object of the statute in question, like that to which it refers, was to have such an important instrument as an election certificate bear about it the same earmarks of genuineness and authenticity as an instrument affecting real estate, by having it not only signed, but also *acknowledged.*   It is very easy to see what abuses might readily spring up if such a safeguard as an acknowledgment of the instrument were not required.

II.   But it is strenuously urged for the relator that the duties of the respondent secretary are strictly *ministerial;* that he is not clothed with any judicial powers.   This is granted, and has already been sufficiently answered in the preceding paragraph in reference to the incompleteness of the O'Malley certificate.

But it may be further said in answer to the contention made, that, though the secretary of state is a ministerial officer, yet he does not for that reason occupy the attitude of a mere figure-head or automaton, moved about at the whim or touch of every eager applicant who desires the performance of duties which pertain to his office.

When applied to for the discharge of such duties, although his discretion may not reach the height known as *judicial,* and, therefore, uncontrollable by writ of *mandamus,* yet it cannot be doubted that some portion of the qualities and attributes of discretion necessarily inhere in the discharge of his official duties, requiring him to consider before acting and to search and inquire before reaching or announcing a conclusion.   Any other theory would be wholly inconsistent with the proper and orderly discharge of his official duties.   His course in this

respect in the case at bar, in filing the O'Neill certifi-
cate, and in certifying his nomination to the recorder of
voters, etc., as the result of a subsequent primary elec-
tion and convention held in obedience to the order of
the Democratic state committee, is free from fault, as
will presently be more fully shown.

III.   The testimony taken in this cause fully sus-
tains the position of the respondent secretary as to
Democratic precedent and usage in respect to the state
committee of that party having a supervisory contro-
and authority over subordinate local committees and
organizations in many particulars.

And, aside from testimony to that effect, it would
seem inherently necessary in *all* party organizations
that there should be some governing head, some con-
trolling power, some common arbiter, which, if emer-
gency should arise therefor, can lay its hand on the
heads of warring factions within the party, and compel
the observance of wholesome regulations conducive alike
to efficient party organization, order, fair dealing and
good government.   Certainly a court of justice could not
look with unpropitious eye on all proper rules which
would protect every citizen in the untrammeled exercise
of their choice in selecting those for whom they desire
that their suffrages shall ultimately be cast.

The same considerations which should induce courts
of justice to maintain the purity of the ballot-box, when
the final vote is taken, should equally operate with
them to promote honesty and prevent and condemn
fraud when a preliminary vote is taken or a nominating
convention held.   There can be no difference in prin-
ciple in its application to the various situations men-
tioned.

And though it is said that "*the decalogue has no
place in politics*," yet when the tribunals of the country
are appealed to in matters having political complexion
and bearing ; when once they acquire jurisdiction in a

proper way of such matters, they will administer justice, promote honest dealing and condemn fraud precisely as they do when administering the law in cases sounding in damages or sounding in contract.

From the evidence adduced in this cause no doubt can be entertained but that the Democratic state committee, acting upon well-established party usage and precedent, had the right and authority to interpose as they did in the eighth congressional district in the interest, not only of their party organization, but also in the interest of good order and fair dealing. If the shackles of party organization, approved by precedent and sanctioned by long years of usage, hang too heavily on the wrists of any member of that party, *his remedy is at once direct and simple.* He certainly cannot claim the benefits of party organization, while at the same time denying the obligatory force of all reasonable party regulations. These remarks sufficiently dispose of objections to the authority of the state committee to interfere as they did. There is therefore no force or merit in the objections considered from any standpoint.

But leaving this view altogether out of consideration, conceding that the state committee had no such powers as aforesaid, this concession does not better at all the condition of the relator, because when the state committee, assuming to exercise such powers, summoned the rival contestants before them, and those contestants submitted to that assumed authority, and consented in writing that the committee should settle their differences and that they would abide the result of the decision thus to be made, it was certainly too late for either party to such award to retract the consent thus given to the award the committee subsequently made. And it was quite as competent for the contesting parties to submit such a question to arbitration, as any other matter of difference which might arise between them.

Having made such an agreement, and the committee after hearing witnesses, and after full deliberation, having acted thenceforth, the parties to such agreement were concluded and estopped from resorting to, or insisting upon, any former *status* or rights which either may have possessed prior to such arbitration and award.

"If one, without actually inducing another to act in a particular way, assent to the thing done, and seek to derive a benefit from it, he cannot in case of disappointment deny the validity of the act assented to. Thus, if a man offer himself, or consent to appear, as a candidate for office at an election held with his assent at an unauthorized voting place, he will be estopped, if defeated, to say that the election was invalid because the voting was at the wrong place." Bigelow on Estop. [5 Ed.] 687, and cas. cit.

*A fortiori*, then, is O'Malley estopped in the circumstances mentioned from denying either the authority of the state committee or the validity of their award.

The foregoing are among the reasons which induced us on a former occasion to announce our conclusion denying the issuance of a peremptory writ. All concur; BARCLAY, J., in paragraph 4.

### SEPARATE OPINION.

BARCLAY, J.—As the relator and the opposing candidate, Mr. O'Neill, voluntarily submitted the controversy between them, touching the congressional nomination, to the arbitrament of the state central committee, and as the latter acted and decided thereon as described in the fourth paragraph of the foregoing opinion, the case is a very plain one against relator upon the principles of law governing arbitration and award, and makes it unnecessary, it seems to me, to discuss any other question.